## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 1:16-cv-20830-KMW

ROBIN MCNEIL, LESLIE LEWIS, KIMBERLEY
JAMES, ELIJAH LOWE, AND BRENDA LOWE on
behalf of themselves and all others similarly situated,

              Plaintiffs,

                                    **CLASS ACTION**

v.                                     **JURY DEMAND**

LOANCARE, LLC and AMERICAN
SECURITY INSURANCE COMPANY,

              Defendants.

_____/

### CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Plaintiffs file this consolidated class action complaint on behalf of themselves and all others similarly situated against LoanCare, LLC ("LoanCare") and American Security Insurance Company ("ASIC").

### INTRODUCTION

1.    LoanCare is a leading national provider of full-service residential servicing to the mortgage industry.  It services nearly 220,000 mortgage loans and its mortgage loan portfolio is valued at more than $36.5 billion.  LoanCare has been offering mortgage loan servicing solutions since 1991.  LoanCare has had an arrangement with ASIC and its affiliates during the class period whereby ASIC performs many of LoanCare's mortgage-servicing functions and is the exclusive provider of force-placed insurance ("FPI") coverage for homeowners with mortgage loans owned or serviced by LoanCare.

2.    In exchange for providing ASIC with the exclusive right to monitor the entire LoanCare loan portfolio and force-place their own insurance coverage, ASIC provides LoanCare

with various kickbacks that Defendants disguise as legitimate compensation. These kickbacks include, but are not limited to, one or more of the following: (1) unearned "commissions" paid to a LoanCare affiliate for work purportedly performed to procure individual policies; (2) "expense reimbursements" allegedly paid to reimburse LoanCare for expenses it incurred in the placement of force-placed insurance coverage on homeowners; (3) payments of illusory reinsurance premiums that carry no commensurate transfer of risk; and (4) free or below-cost mortgage-servicing functions that ASIC performs for LoanCare.  Because of these kickbacks, LoanCare essentially receives a rebate on the cost of the force-placed insurance; however, LoanCare homeowners ultimately bear the cost of these kickbacks because LoanCare and ASIC do not pass on these rebates to the borrower. The charges for force-placed insurance are deducted from borrowers' escrow accounts and Defendants attempt to disguise the kickbacks as legitimate by characterizing them as income earned by LoanCare when, in fact, they are unearned, unlawful profits.

3.    This exclusive and collusive relationship has resulted in extraordinary profits for the Defendants totaling millions of dollars for both LoanCare and ASIC.[1]  While many banks and insurance entities have ceased these practices as a result of class action lawsuits brought nationwide and various state and federal investigations, this class action has been brought to: (1) adequately compensate LoanCare homeowners for their monetary loss, and (2) enjoin such practices by these Defendants in the future.

4.    Thirteen force-placed insurance class actions litigated to resolution in this district over the past five years have ended with certification of a Florida or nationwide class.  These

---

[1] These extraordinary profits are demonstrated by the extremely low loss ratios for the force-placed insurance product – typically in the range of 20-30%.  Loss ratios on homeowner's voluntary insurance is typically above 50%.

FA7852

cases have made available more than three billion dollars in relief to many millions of class members and involved the coordination of twenty-one different law firms representing class representatives from across the country. Assurant, Inc. ("Assurant") and its subsidiary, American Security Insurance Company ("ASIC"), a defendant in this case, have advocated for judicial approval of nine of these nationwide settlements, never once raising any opposition to certification of the proposed settlement classes.

5. There is no dispute that mortgage lenders and servicers like LoanCare have charged homeowners hundreds of millions of dollars in recent years for FPI coverage provided by Assurant, which controls the majority of the market for FPI. Defendants ASIC, an Assurant subsidiary, and LoanCare, have reaped extraordinary profits from this closed market by entering into exclusive arrangements for the provision of FPI, whereby LoanCare is provided below-cost mortgage servicing and ASIC and its affiliates kick illusory "expense reimbursements" back to LoanCare, all at borrowers' expense.

6. After years of hard-fought litigation in class actions brought across the nation, many before this Court, and after extensive investigations by numerous state and federal insurance regulators, some of the wrongful practices that are the subject of this lawsuit have abated or been prohibited. State and federal regulators have concluded that many of Defendants' actions are wrongful and have prohibited certain practices in particular states for an uncertain amount of time. By certifying the specific classes proposed by Plaintiffs against LoanCare, the Court will avail hundreds of thousands of LoanCare homeowners who were directly affected by these practices of their only opportunity to seek monetary damages, and Plaintiffs of the opportunity to ensure that Defendants will cease their illegal practices for all LoanCare borrowers nationwide for years to come.

FA7852

7.     During the proposed class period, ASIC and LoanCare treated Plaintiffs and every putative class member in an identical manner by: (1) notifying them that their coverage had lapsed and new coverage had been forced with the same cycle of form letters; (2) forcing coverage for every borrower from one master policy that covered LoanCare's entire loan portfolio; (3) forcing new coverage in the same manner for every member of the proposed classes; and (4) including the same impermissible costs in the amounts charged every putative class member for coverage.  This Court has certified litigation and settlement classes in twelve nationwide class action cases involving FPI.

8.     In *Williams v. Wells Fargo Bank, N.A.,* which involved some of the same claims and legal theories at issue here, Judge Scola found that the plaintiffs' allegations and evidence of a common scheme supported certification of the proposed class, reasoning:

> The essence of this case, as alleged, is a common scheme to systematically, and without any individual consideration, force-place insurance at an excessive rate to every person whose self-placed property insurance had lapsed.  The determination of the truth or falsity of the Plaintiffs' allegations that Wells Fargo and [its force-placed insurer] engaged in a scheme to force-place insurance with inflated and excessive premiums will resolve an issue that is central to the validity of each one of the claims in one stroke.

*Williams v. Wells Fargo Bank, N.A.,* 280 F.R.D. 665, 672 (S.D. Fla. 2012).  Courts have reached the same well-reasoned conclusion in other cases certifying classes in connection with similar FPI kickback schemes.  *See, e.g., Ellsworth v. U.S. Bank, N.A.,* No. 12-cv-02506, 2014 WL 2734953 (N.D. Cal. June 13, 2014) (certifying multistate force-placed flood insurance breach of contract claims); *Lane v. Wells Fargo Bank, N.A.,* No. 12-cv-4026, 2013 WL 3187410 (N.D. Cal. June 21, 2013) (certifying statewide force-placed insurance breach of contract claims).   The reasoning of *Williams, Ellsworth,* and *Lane* will apply with equal force here.

9.     Lenders and servicers, like LoanCare here, force place insurance coverage when a

FA7852

borrower fails to obtain or maintain proper hazard, flood, or wind insurance coverage on the property that secures his or her loan.  Under the typical mortgage agreement, if the insurance policy lapses or provides insufficient coverage, the lender has the right to "force place" new coverage on the property to protect its interest and then charge the borrower the cost of coverage. The Defendants' force-placed insurance scheme takes advantage of the broad discretion afforded the lenders and servicers in standard form mortgage agreements.

10.     The money to finance force-placed insurance schemes comes from unsuspecting borrowers who are charged inflated amounts for force-placed insurance by lenders or servicers – LoanCare here.  Borrowers are required to pay the full amount that the lender or servicer initially pays to the insurer – here ASIC and affiliates – despite the fact that a considerable portion of that amount is kicked back to the lender or servicer in the manner described above.  LoanCare gets the benefit of an effective rebate from ASIC that it does not pass on to the borrower.  Instead it charges the borrower the full amount, purportedly for the cost of insurance coverage.  Lenders and servicers, like LoanCare, and their exclusive force-placed insurers, ASIC, reap these unconscionable profits entirely at the expense of the unsuspecting borrowers.

11.     At a recent hearing on force-placed insurance held by the National Association of Insurance Commissioners ("NAIC"), Birny Birnbaum, the foremost expert on the force-placed insurance market, illustrated the staggering growth in profits that Defendants' schemes have reaped in recent years:[2]

---

[2] This graph and the ones that follow were taken from Mr. Birnbaum's presentation to the NAIC on August 9, 2012.  The presentation is available at:
http://www.naic.org/documents/committees_c_120809_public_shearing_lender_placed_insurance_presentation_birnbaum.pdf.

FA7852

**LPI Premiums Have Quadrupled Since 2004**

| Year | Gross Written Premium ($ Millions) | Net Written Premium ($ Millions) |
|---|---|---|
| 2004 | $1,485 | $796 |
| 2005 | $1,832 | $919 |
| 2006 | $2,163 | $1,074 |
| 2007 | $3,058 | $1,647 |
| 2008 | $4,000 | $2,209 |
| 2009 | $5,181 | $3,049 |
| 2010 | $5,915 | $3,223 |
| 2011 | $5,692 | $3,450 |
| 2004-2011 | $29,326 | $16,368 |

2009-2011 GWP Understated, Reporting Errors by QBE

CEJ LPI Presentation to NAIC                                13                                    August 9, 2012

12.     Assurant, Inc. which works through its subsidiaries, like ASIC, is one of two major insurance companies that control close to 100% of the market for force-placed insurance. As shown below, Assurant held 58.6% of the nationwide market share for force-placed insurance in 2011. Together, Assurant and QBE/Balboa, the other major insurer with a significant market share, controlled 99.7% of the market in the same year, and held no less than 96.1% of the market between 2004 and 2011. Mortgage lenders and servicers sustain the insurers' monopoly by agreeing to purchase all force-placed insurance from the two insurers in exchange for kickbacks and other benefits.

6

FA7852

### Assurant and QBE Are the Market for LPI: Countrywide Market Share

| Year | Assurant | QBE/Balboa | Assurant + QBE/Balboa |
|------|----------|------------|------------------------|
| 2004 | 68.2% | 29.8% | 98.0% |
| 2005 | 69.7% | 26.4% | 96.1% |
| 2006 | 79.2% | 19.5% | 98.7% |
| 2007 | 74.0% | 25.4% | 99.4% |
| 2008 | 74.2% | 25.5% | 99.7% |
| 2009 | 57.2% | 42.4% | 99.7% |
| 2010 | 56.2% | 43.5% | 99.7% |
| 2011 | 58.6% | 41.1% | 99.7% |

CEJ LPI Presentation to NAIC                    18                    August 9, 2012

13.      It is no surprise that these practices have come under increased scrutiny in recent years by the government and regulators.  For example:

- On March 21, 2013, the New York Department of Financial Services' ("NYDFS"), investigation into force-placed insurance practices "produced a major settlement with the country's largest 'force-placed' insurer, Assurant, Inc. . . . [The settlement] includes restitution for homeowners who were harmed, a $14 million penalty paid to the State of New York, and industry-leading reforms that will save homeowners, taxpayers, and investors millions of dollars going forward through lower rates."[3]  Further, under the Consent Order entered, Assurant and its subsidiaries (including ASIC), are prohibited from paying commissions to any servicers or entity affiliated with a servicer on force-placed insurance policies obtained by the servicer.  *See* Assurant & NYDFS Consent Order, Mar. 21, 2013, at 9.

- At the NYDFS hearings on May 17, 2012 related to the force-placed insurance market, the Superintendent of Financial Services, Benjamin Lawsky, stated that the Department's initial inquiry uncovered "serious concerns and red flags" which included: 1) exponentially higher premiums, 2) extraordinarily low loss ratios, 3) lack of competition in the

---

[3] *See Cuomo Administration Settles with Country's Largest Force-Placed Insurer, Leading Nationwide Reform Effort and Saving Homeowners, Taxpayers, and Investors Millions of Dollars*, Dep't of Fin. Servs., Mar. 21, 2013, *available at,* http://www.dfs.ny.gov/about/press2013/pr1303211.htm.

7

market, and 4) tight relationships between the banks, their subsidiaries, and insurers.  He went on to state:

> In sum when you combine [the] close and intricate web of relationships between the banks and insurance companies on the one hand, with high premiums, low loss ratios, and lack of competition on the other hand, it raises serious questions . . . .

- The National Association of Insurance Commissioners (NAIC) also held hearings on force-placed insurance in August 2012 which included a discussion of "reverse competition" in the force-placed insurance market. The NAIC's website explains:

> A key regulatory concern with the growing use of lender-placed insurance is "reverse competition," where the lender chooses the coverage provider and amounts, yet the consumer is obligated to pay the cost of coverage. Reverse competition is a market condition that tends to drive up prices to the consumers, as the lender is not motivated to select the lowest price for coverage since the cost is born by the borrower. Normally competitive forces tend to drive down costs for consumers. However, in this case, the lender is motivated to select coverage from an insurer looking out for the lender's interest rather than the borrower.[4]

- The Consumer Financial Protection Bureau's new regulations on force-placed insurance became final on January 17, 2013 and prohibit servicers of federally regulated mortgage loans from force-placing insurance unless the servicer has a reasonable basis to the believe the borrower's insurance has lapsed and require the servicer to provide three notices of the force-placement in advance of issuing the certificate of insurance.[5]

- On December 18, 2013, Fannie Mae issued its Servicing Guide Announcement related to force-placed insurance that, among other things, prohibits servicers from including any commissions, bonuses, or other incentive compensation in the amounts charged to borrowers for force-placed insurance and further requires that the force-placed insurance carrier cannot be an affiliated entity of the servicer.[6]

---

4 *See* http://www.naic.org/cipr_topics/topic_lender_placed_insurance.htm.

5 *See* Consumer Financial Protection Bureau Proposes Rules to Protect Mortgage Borrowers" available at http://www.consumerfinance.gov/pressreleases/consumer-financial-protection-bureau-proposes-rules-to-protect-mortgage-borrowers/
6 *See* https://www.fanniemae.com/content/announcement/svc1327.pdf

FA7852

14.      Florida has been at the epicenter of all force-placed insurance activity nationwide—more than one-third of all force-placed premiums are placed in Florida, three times more than in California, which has the second-highest volume.  The ASIC actuarial department that sets the rates for all force-placed insurance nationwide is located here in Miami, Florida.

15.      In his presentation to the NAIC, Mr. Birnbaum illustrated the astounding rise in force-placed insurance policies in Florida:

**LPI Premium by State:  Florida Has Become Ground Zero**

|      | 2004  | 2005  | 2006  | 2007  | 2008  | 2009  | 2010  | 2011  |
|------|-------|-------|-------|-------|-------|-------|-------|-------|
| FL   | 10.6% | 10.8% | 13.3% | 17.9% | 22.9% | 34.3% | 36.7% | 35.1% |
| CA   | 20.8% | 19.3% | 21.2% | 23.5% | 24.3% | 14.0% | 11.1% | 10.2% |
| TX   | 10.6% | 10.7% | 8.8%  | 8.7%  | 7.0%  | 5.6%  | 5.6%  | 6.1%  |
| NY   | 3.6%  | 3.6%  | 4.5%  | 4.4%  | 4.3%  | 4.7%  | 5.4%  | 5.6%  |
| IL   | 3.0%  | 3.3%  | 3.9%  | 3.7%  | 3.9%  | 4.4%  | 4.1%  | 4.6%  |
| NJ   | 2.9%  | 2.7%  | 2.9%  | 2.7%  | 2.7%  | 2.9%  | 3.4%  | 4.0%  |
| MI   | 4.2%  | 4.4%  | 4.4%  | 5.8%  | 3.6%  | 2.7%  | 2.2%  | 2.0%  |
| OH   | 3.6%  | 3.8%  | 3.5%  | 2.7%  | 2.4%  | 2.2%  | 2.3%  | 2.9%  |
| GA   | 3.4%  | 3.2%  | 3.2%  | 2.4%  | 2.3%  | 2.3%  | 2.3%  | 2.3%  |
| PA   | 2.6%  | 2.6%  | 2.7%  | 1.8%  | 1.8%  | 1.8%  | 1.7%  | 1.8%  |

CEJ LPI Presentation to NAIC                    15                         August 9, 2012

16.      Defendants' self-dealing and collusion in the force-placed insurance market has caused substantial harm to the named Plaintiffs and the proposed classes they seek to represent. Plaintiffs do not challenge the cost of the FPI *per se*, nor do they challenge the insurance rates filed in any State by ASIC.  This class action seeks to redress that harm on behalf of the Plaintiffs and the proposed class members relating to Defendants' manipulation of the force-placed insurance process whereby LoanCare receives an effective rebate on the cost of the FPI but does not pass the rebate on to the borrowers.

FA7852

## PARTIES

**Plaintiffs**

17.     Plaintiff Leslie Lewis is a citizen of the State of New York.  She is a natural person over the age of 21 and otherwise *sui juris.*

18.     Plaintiff Robin McNeil is a citizen of the State of Florida.  She is a natural person over the age of 21 and otherwise *sui juris.*

19.     Plaintiff Elijah Lowe is a citizen of the State of Florida.  He is a natural person over the age of 21 and otherwise *sui juris.*

20.     Plaintiff Brenda Lowe is a citizen of the State of Florida.  She is a natural person over the age of 21 and otherwise *sui juris.*

21.     Plaintiff Kimberley James is a citizen of the State of Florida.  She is a natural person over the age of 21 and otherwise *sui juris.*

**Defendants**

22.     Defendant AMERICAN SECURITY INSURANCE COMPANY is a Delaware corporation and an indirect subsidiary of Assurant Inc., writing force-placed insurance policies in all fifty states and the District of Columbia with its principal address in Atlanta, Georgia.  ASIC along with its affiliates often operate under the trade name "Assurant Specialty Property."  ASIC contracts with the lenders to act as a force-placed insurance vendor and take over certain mortgage servicing functions.  Its duties include, but are not limited to, tracking loans in their mortgage portfolio, new loan boarding, loss draft functions, escrow analysis, handling customer service duties, and securing force-placed insurance policies on properties when a borrower's insurance has lapsed.  ASIC's actuarial department which sets the rates for force-placed insurance is located in Miami, Florida.

10

23.     Defendant LOANCARE LLC is a Virginia limited liability company with headquarters in Virginia Beach, Virginia.  LoanCare is mortgage servicer and conducts business throughout the United States, including specifically in this District. LoanCare was formally known as FNF Servicing, Inc. and did business as "LoanCare, a division of FNF Servicing, Inc."

## JURISDICTION AND VENUE

24.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (codified in various sections of 28 U.S.C.).

25.      Plaintiffs are citizens of the State of Florida and New York with property in those states.  Defendants are citizens of various other states but are registered to do business in the aforementioned states.  The amount in controversy exceeds $5,000,000 and there are at least one hundred members of the putative class.

26.     This Court has jurisdiction over Defendants because they are foreign corporations authorized to conduct business in Florida, are doing business in Florida and have registered with the Florida Secretary of State, or do sufficient business in Florida, have sufficient minimum contacts with Florida, or otherwise intentionally avail themselves of the Florida consumer market through the promotion, marketing, sale, and service of mortgages or other lending services and insurance policies in Florida.  This purposeful availment renders the exercise of jurisdiction by this Court over Defendants and their affiliated or related entities permissible under traditional notions of fair play and substantial justice.

27.      In addition, this Court has subject-matter jurisdiction under CAFA because the amount in controversy exceeds $5 million and diversity exists between Plaintiffs and the Defendants.  28 U.S.C. § 1332(d)(2).  Further, in determining whether the $5 million amount in

FA7852

controversy requirement of 28 U.S.C. § 1332(d)(2) is met, the claims of the putative class members are aggregated.  28 U.S.C. § 1332(d)(6).

28.     Venue is proper in this forum pursuant to 28 U.S.C. § 1391. Defendants transact business and may be found in this District.

29.     All conditions precedent to this action have occurred, been performed, or have been waived.

### FACTUAL ALLEGATIONS

30.     Permitting a lender to forcibly place insurance on a mortgaged property and charge the borrower for the cost of the coverage is neither a new concept nor a term undisclosed to borrowers in mortgage agreements.  The standard form mortgage agreements owned or serviced by LoanCare include a provision requiring the borrower to maintain hazard insurance coverage, flood insurance coverage if the property is located in a Special Flood Hazard Area as determined by the Federal Emergency Management Agency, and wind insurance coverage on the property securing the loan, and in the event the insurance lapses, permit the lender to obtain force-placed coverage and charge the borrower for the cost rather than declare the borrow in default.

31.     What is unknown to borrowers and not disclosed in the mortgage agreements is that LoanCare has exclusive arrangements with ASIC and its affiliates, to manipulate the force-placed insurance market and charge borrowers more for force-placed insurance than what LoanCare itself pays.  The charges are inflated to provide LoanCare and its affiliates with kickbacks in the form of "commissions," "qualified expense reimbursements," or reinsurance arrangements, and to cover the cost of discounted mortgage servicing functions, and other unmerited charges.  The borrower is then forced to pay these inflated amounts.

FA7852

## The Force-Placed Insurance Scheme

32.     ASIC has entered into an exclusive arrangement with LoanCare to provide various mortgage servicing functions at below-cost; mortgage servicing functions that are properly LoanCare's responsibility and that LoanCare is paid to perform by the owners of loans. ASIC also contracts to monitor LoanCare's mortgage loan portfolio and force-place insurance when an individual borrower's voluntary policy lapses, both obligations properly borne by LoanCare.   In addition to the subsidized mortgage services LoanCare receives from ASIC, a percentage of borrowers' force-placed insurance charges are "kicked back" and paid directly to LoanCare.

33.     The scheme works as follows.  LoanCare contracts for ASIC to take over various mortgage servicing functions and for a master insurance policy that covers its entire portfolio of mortgage loans.  In exchange, ASIC and its affiliates are given the exclusive right to be the sole force-place insurance provider on property securing a loan within the portfolio when the borrower's insurance lapses or the lender determines the borrower's existing insurance is inadequate.

34.     ASIC and its affiliates monitor LoanCare's entire loan portfolio for lapses in borrowers' insurance coverage.  Once a lapse is identified, an automated cycle of notices, purporting to come from LoanCare but actually generated by ASIC, is sent to the borrowers to inform them that insurance will be purchased and force-placed if the voluntary coverage is not continued.  In reality, however, the master policy is already in place and LoanCare does not purchase a new policy on the individual borrower's behalf, rather, a certificate of insurance from the master policy is automatically issued by ASIC.  If a lapse continues, the borrower is notified that insurance is being force-placed at his or her expense.

13

FA7852

35.     No individualized underwriting ever takes place for the force-placed coverage. Insurance is automatically placed on the property and the inflated amounts, including the unlawful kickbacks, are charged to the borrower.  In many instances, the insurance lapse is not discovered for months or even years after the fact.  Despite the absence of any claim or damage to the property during the period of lapse, coverage is placed on the property and the borrower is charged for the "cost" of the retroactive coverage.

36.     LoanCare then pays ASIC for the certificate of insurance, which issues from the already-existing master policy.  It is LoanCare, not the borrower, that is obligated to pay ASIC for the force-placed insurance pursuant to the agreements between LoanCare and ASIC (and borrowers are not parties to), which govern the mortgage servicing functions that ASIC performs as well as the procurement of the master policy, and are executed and already in place before the borrower's coverage lapses.

37.     Once coverage issues and LoanCare has paid ASIC the full amount invoiced, ASIC kicks back a set percentage of that amount to LoanCare without LoanCare performing any functions related to the placement of coverage or incurring any costs.  The kickbacks paid to LoanCare or its affiliates are disguised as "commissions," "reinsurance payments," or "expense reimbursements."  Upon information and belief, any LoanCare affiliate that receives the kickback passes along that payment to LoanCare, sometimes in the form of "soft dollar" or other credits.

38.     The payment is not compensation for work performed; it is an effective rebate on the premium amount, reducing the cost of coverage that LoanCare pays to ASIC.  The "commissions" or "expense reimbursements" are not legitimate reimbursements for actual costs, nor are they payments that have been earned for any work done by LoanCare or an affiliate related

FA7852

to the placement of the insurance; they are unlawful kickbacks to LoanCare for the exclusive arrangement to force-place insurance.

39.     The money paid back to LoanCare and its affiliates is not given in exchange for any services provided by them; it is simply grease paid to keep the force-placed machine moving.  In an attempt to mask the kickbacks as legitimate, ASIC, in letters purporting to come from LoanCare, will often disclose to the borrower that LoanCare or its affiliates may earn commissions or compensation as a result of the forced placement of new coverage.  In reality, however, no work is ever done by LoanCare or its affiliates to procure insurance for that particular borrower because the coverage comes through the master policy already in place – and the process is largely automated by ASIC.  As a result, no commission or compensation is "earned" and, in addition, neither LoanCare nor its affiliates incur any costs in relation to force-placing insurance on any particular borrower and therefore no "expense reimbursement" is due.

40.     Once the certificate of insurance is issued on an individual borrower, LoanCare then charges the borrower the full, "pre-rebate" amount for the coverage while purporting to charge the borrower the cost of the insurance coverage in keeping with the borrower's mortgage agreement.  The inflated amount is either deducted from the borrower's mortgage escrow account or added to the balance of the borrower's loan.[7]  The borrower's escrow account is depleted irrespective of whether other escrow charges, such as property taxes, are also due and owing.

41.     Under this highly profitable force-placed insurance scheme, LoanCare is incentivized to purchase and force-place insurance coverage with artificially inflated premiums on a borrower's property because the higher the cost of the insurance policy, the higher the

---

[7] On some occasions, when a borrower does not have an escrow account, an escrow account with a negative balance is created and the borrower is charged to bring the balance to zero.

FA7852

kickback.  And, as a result of the kickbacks, LoanCare effectively pays a reduced amount for force-placed insurance coverage but does not pass these savings on to its borrowers.

42.     ASIC and LoanCare also enter into agreements for ASIC to provide mortgage servicing activities on LoanCare's entire loan portfolio at below cost.  These activities include, but are not limited to, services such as new loan boarding, escrow administration, and loss draft functions – many of which have little or nothing to do with force-placed insurance.  ASIC offers to take on these mortgage servicing functions – which are LoanCare's responsibility pursuant to its agreements with the owners of the loans – at a discount to maintain its exclusive right to force-place insurance on LoanCare borrowers. Indeed, ASIC does not perform these services for a lender without also being the exclusive provider of force-placed insurance.

43.     The full costs of the servicing activities are added into the force-placed amounts which are then passed on to the borrower.  ASIC and its affiliates are able to provide these services at below cost because of the enormous profits they make from the hyper-inflated amounts charged for force-placed insurance.  However, because insurance-lapsed mortgaged property typically comprises only 1-2% of the lenders' total mortgage portfolio, the borrowers who pay the charges from the lenders unfairly bear the entire cost to service the entire loan portfolio – despite many of the services having nothing to do with force-placed insurance.  These charges, passed on to Plaintiffs and the proposed Class members, are not properly chargeable to the borrower because they are expenses associated with the servicing of all the loans and the loan servicers are already compensated for these activities by the owners of the loans (e.g., Fannie Mae).

44.     The small percentage of borrowers who are charged for force-placed insurance shoulder the costs of monitoring LoanCare's entire loan portfolio, effectively resulting in a

FA7852

kickback.

45.     In addition, upon information and belief, ASIC enters into essentially riskless "captive reinsurance arrangements" with LoanCare's affiliates to "reinsure" the property insurance force-placed on borrowers.   A recent *American Banker* article illustrated this reinsurance problem using JPMorgan Chase's program by way of example:

> JPMorgan and other mortgage servicers reinsure the property insurance they buy on behalf of mortgage borrowers who have stopped paying for their own coverage. In JPMorgan's case, 75% of the total force-placed premiums cycle back to the bank through a reinsurance affiliate. This has raised further questions about the force-placed market's arrangements. . . .
>
> Over the last five years, Chase has received $660 million in reinsurance payments and commissions on force-placed policies, according to New York's DFS. . . .
>
> Of every hundred dollars in premiums that JPMorgan Chase borrowers pay to Assurant, the bank ends up keeping $58 in profit, DFS staff asserted. The agency suggested the bank's stake in force-placed insurance may encourage it to accept unjustifiably high prices by Assurant and to avoid filing claims on behalf of borrowers, since that would lower its reinsurer's returns.
>
> The DFS staff also questioned the lack of competition in the industry, noting that Assurant and QBE have undertaken acquisitions that give them long-term control of 90% of the market.  Further limiting competition are the companies' tendency to file identical rates in many states, Lawsky and his staff argue.

J. Horwitz, *Chase Reinsurance Deals Draw New York Regulator's Attacks*, AM. BANKER, May 18, 2012, *available at* http://www.americanbanker.com/issues/177_97/chase-reinsurance-deals-regulator-attack-1049460-1.html.

46.     LoanCare's reinsurance program, like those of other lenders, is simply a way to funnel profits, in the form of ceded premiums, to LoanCare at borrowers' expense.   While reinsurance can, and often does, serve a legitimate purpose, here it does not.  On information and belief, LoanCare or its affiliates enter into reinsurance agreements with ASIC that provide that

17

the insurer will return significant percentages of the force-placed insurance charges by way of ceded reinsurance premiums to LoanCare affiliates or subsidiaries – which in turn pass on these profits to LoanCare.  The ceded premiums are nothing more than a kickback to LoanCare and a method for LoanCare to profit from the forced placement of new coverage.  Indeed, while LoanCare or its affiliates purportedly provided reinsurance, they did not assume any real risk.

47.     LoanCare also overcharges borrowers by disregarding the Standard Mortgage Clause or the Lender's Loss Payable Endorsement ("LLPE") in the standard form mortgage agreement.  Both of these clauses typically protect the lender for a period of at least ten days after the termination of the homeowner's voluntary insurance policy.  Force-placed insurance policies, however, take effect on the date of termination, and "double-cover" the property unnecessarily during the period covered by the LLPE or Standard Mortgage Clause.  This means the borrower is charged for coverage for which the lender or servicer has no exposure.

48.      The amounts charged borrowers are also inflated by the interest that accrues on the amounts owed for force-placed coverage; when LoanCare adds the charge for the force-placed insurance to a homeowner's mortgage balance, it thereby increases the interest paid over the life of the loan by the homeowner to the lender.

49.     The actions and practices described above are unconscionable and undertaken in bad faith with the sole objective to maximize profits.  Borrowers who for whatever reason have stopped paying for insurance or are under-insured on mortgaged property are charged hyper-inflated and illegitimate noncompetitive amounts for force-placed insurance.  These charges are inflated to include undisclosed kickbacks to the Defendants or their affiliates (who, as described above, perform little to no functions related to the force-placement of the individual policies), as well as the cost of captive reinsurance arrangements, and discounted mortgage servicing

FA7852

functions.

50.      Borrowers have no say in the selection of the force-placed insurance carrier or the terms of the force-placed insurance policies.  Force-placed policies are commercial insurance policies with premiums intended for all lender or servicer clients of ASIC and are meant to protect their interest in the property.[8]  The terms are determined by the lender or servicer - LoanCare, and the insurer - ASIC.  Because they are commercial policies, borrowers cannot purchase force-placed policies on their own.

51.      Plaintiffs here do not challenge LoanCare's right to force place insurance in the first instance.  They challenge Defendants' manipulation of the force-placed insurance market with an eye toward artificially inflating the amounts charged for force-placed insurance through unlawful kickback arrangements and placing unnecessary coverage, which LoanCare purchases from ASIC and then chooses to pass on to the borrower.  Lenders or servicers, like LoanCare, are financially motivated to utilize the insurer, like ASIC, that offers it the best financial benefit in the terms of "commissions," "expense reimbursements," discounted mortgage servicing functions, or ceded reinsurance premiums.

52.      This action is brought to put an end to Defendants' exclusive, collusive, and uncompetitive arrangements.  Plaintiffs seek to recover the improper charges passed on to them and other LoanCare borrowers nationwide through their claims for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, tortious interference with a contract or advantageous business relationship, and violations of the Federal Truth in Lending Act ("TILA"), and the Racketeer Influenced and Corrupt Organizations Act ("RICO").

**Plaintiff – Leslie Lewis**

---

[8] Indeed, ASIC's master insurance policy is entitled "Mortgagee Interest Protection" and it is the lender or servicer named as the insured on the certificates that are issued.

FA7852

53.     Plaintiff Lewis owns a home in Staten Island, New York.

54.     Paragraphs 4   and 7 of the Lewis mortgage contract state in pertinent part as

follows:

> 4.      **Fire, Flood and Other Hazard Insurance.** Borrower shall insure all improvements on the Property, whether now in existence or subsequently erected, against any hazards, casualties, and contingencies, including fire, for which the Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. Borrower shall also insure al improvements on the Property, whether now in existence or subsequently erected, against loss by floods to the extent required by the Secretary. All insurance shall be carried with companies approved by the Lender. The insurance policies and any renewals shall be held by Lender and shall include loss payable clauses in favor of, and in a form acceptable to, Lender.
>
> In the event of loss, Borrower shall give Lender immediate notice by mail. Lender may make proof of loss if not made promptly by Borrower. Each insurance company concerned is hereby authorized and directed to make payment for such loss directly to Lender, instead of to Borrower and to Lender jointly. All or any part of the insurance proceeds may be applied by Lender, at its option, either (a) to the reduction of the indebtedness under the Note and this Security Instrument, first to any delinquent amounts applied in the order in paragraph 3, and then to prepayment of principal, or (b) to the restoration or repair of the damaged Property. Any application of the proceeds to the principal shall not extend or postpone the due date of the monthly payments which are referred to in paragraph 2, or change the amount of such payments. Any excess insurance proceeds over an amount required to pay all outstanding indebtedness under the Note and this Security Instrument shall be paid to the entity legally entitled thereto.
>
> In the event of foreclosure of this Security Instrument or other transfer of title to the Property that extinguishes the indebtedness, all right, title and interest of Borrower in and to insurance policies in force shall pass to the purchaser.
> …
>
> **7. Charges to Borrower and Protection of Lender's Rights in the Property**. Borrower shall pay all governmental or municipal charges, fines and impositions that are not included in paragraph 2. Borrower shall pay these obligations on time directly to the entity which is owed the payment. If failure to pay would adversely affect Lender's interest in the

FA7852

Property, upon Lender's request Borrower shall promptly furnish to Lender receipts evidencing these payments.

If Borrower fails to make these payments or the payments required by paragraph 2, or fails to perform any other covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, for condemnation or to enforce laws or regulations), then Lender may do and pay whatever is necessary to protect the value of the Property and Lender's rights in the Property, including payment of taxes, hazard insurance and other items mentioned in paragraph 2.

Any amounts disbursed by Lender under this paragraph shall become an additional debt of Borrower and be secured by this Security Instrument. These amounts shall bear interest from the date of disbursement at the Note rate, and at the option of Lender shall be immediately due and payable.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to payment of the obligation secured by the lien in a manner acceptable to Lender; (b) contests in good faith the lien by, or defends against enforcement of the lien in, legal proceedings which in the Lender's opinion operate to prevent the enforcement of the lien; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any party of the Property is subject to a lien which may attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within 10 days of the giving of notice.

FA7852

Plaintiff Lewis's mortgage contract is attached as **Exhibit A**.

55.     In or around April of 2012, Ms. Lewis's voluntary hazard insurance policy lapsed. LoanCare then purchased a hazard force-placed insurance policy through ASIC and force-placed it on her property.

56.     The cost of that policy was $3,231.00 for the period of April 25, 2012 to April 25, 2013 and Ms. Lewis was charged for, paid, and/or still owes amounts for force-placed coverage in connection with the force-placed insurance policy.

57.     Pursuant to the automated procedures in place, Ms. Lewis received letters regarding the force-placement of the ASIC insurance on May 9, 2012 and June 15, 2012.

58.     The letters misrepresented to Ms. Lewis that LoanCare would be charging her for the "cost" of the insurance and that the higher "cost" of the force-placed insurance policy was "because the insurance we purchase is issued automatically without evaluating the risk of insuring your property," when in fact LoanCare does not charge borrowers the cost of the insurance because as a result of the kickbacks, it pays less for the insurance than what it charges to Ms. Lewis and other borrowers.  Further the higher cost of the force-placed insurance policy was due to the kickback scheme that Defendants have enacted and not due to lack of a risk evaluation.[9]

59.     The letters also misrepresented that LoanCare "have incurred expenses in placing this policy, as a result we may receive reimbursements for such expenses from the insurance company," when in fact, no expenses were actually incurred by LoanCare or its affiliates because they perform no work in conjunction with the placement of the force-placed insurance and

---

[9] In his testimony before the NYDFS, Robert Hunter argued that, "lack of underwriting should also result in much lower acquisition expenses for FPI insurers, since no sales force is required to place the insurance."  *See* Hunter NYDFS Testimony at 5.

FA7852

outsource the servicing of their loans to ASIC.  The placement of the policy is done through ASIC's automated procedures whereby a certificate of insurance is automatically generated and issued pursuant to the master policy once the computer detects a lapse in coverage.

60.     The letters also misrepresented the reinsurance relationship between ASIC and a LoanCare affiliate by stating that the affiliate assumed "some or all of the risk" when in fact a commensurate portion of the risk was not transferred.

61.     Ms. Lewis reviewed the letters, but at no time did any Defendants disclose, in the letters or by any other means, that an exclusive relationship between LoanCare and ASIC was already in place and the "reimbursements" paid to LoanCare was not paid for any actual expenses incurred but was simply a bribe to keep that exclusive force-placed relationship in place.  Nor did Defendants disclose that the risk would not be transferred to the affiliate and the payments would be passed on to LoanCare.

62.     Nor did Defendants disclose to Plaintiff Lewis or the putative Class members that because of this kickback, LoanCare itself would effectively be paying a less than what it would charge to Ms. Lewis for the force-placed insurance coverage.

63.     Finally, it was never disclosed to Ms. Lewis or the Class members that the amounts charged them covered other illegitimate kickbacks and below cost mortgage-servicing functions not properly charged to them. The amounts kicked back to LoanCare were not reduced from the amount charged resulting in Ms. Lewis paying more than the "cost" of the insurance.

64.     All putative Class members received materially similar letters pursuant to the automated procedures used by Defendants.

65.     There are no material differences between these Defendants' actions and practices directed to Ms. Lewis and their actions and practices directed to the putative class.

FA7852

**Plaintiff Robin McNeil**

66.     Plaintiff McNeil took a mortgage loan from Premium Capital Funding, LLC in 2009 on a property in Osceola County, Florida.  At all relevant times, the mortgage loan was serviced by LoanCare.

67.     Paragraphs 4 and 7 of the McNeil mortgage contract are materially the same as paragraphs 4 and 7 of the Lewis mortgage.  *See* ¶ 54, *supra*.  Plaintiff McNeil's mortgage contract is attached as **Exhibit B**.

68.     Ms. McNeil was charged for, paid, and/or still owes amounts for force-placed coverage in connection with the force-placed insurance policies placed on her property between 2012 and 2015.

69.     Pursuant to the automated procedures in place, Ms. McNeil received a letters regarding the placement of the force-placed insurance.  These letters purport to come from LoanCare but were actually sent by ASIC as part of the below-cost mortgage servicing functions it provides to LoanCare.

70.     Upon information and belief, the letters contained misrepresentations to Ms. McNeil similar to those included in the letters sent to Ms. Lewis regarding the cost of force-placed insurance coverage and the kickbacks paid to LoanCare or its affiliates.

71.     At no time did any Defendants disclose to Ms. McNeil, in the letters or by any other means, that an exclusive relationship between LoanCare and ASIC was already in place and that LoanCare was effectively paid for a bribe to keep that exclusive force-placed relationship in place.

72.     Nor did Defendants disclose to Plaintiff McNeil or the putative Class members that, because of this kickback, LoanCare itself would effectively be paying less than the amount

24

it would charge Ms. McNeil for the force-placed insurance coverage.

73.     Finally, it was never disclosed to Ms. McNeil or the putative Class members that the amounts charged to them covered other illegitimate kickbacks and below cost mortgage-servicing functions not properly charged to them. The amounts kicked back to LoanCare were not reduced from the amount charged resulting in Ms. McNeil paying more than the "cost" of the insurance.

74.     All putative class members received materially similar letters pursuant to the automated procedures used by Defendants.

75.     There are no material differences between these Defendants' actions and practices directed to Mr. McNeil and their actions and practices directed to the putative class.

### Plaintiff Kimberley James

76.     Plaintiff James took a mortgage loan from New Freedom Mortgage Corporation ("New Freedom") in 2004 on a property in Spring Hill, Florida.  In March 2012, New Freedom sold, assigned, transferred, and conveyed Ms. James's mortgage to Government National Mortgage Association ("GNMA"). In March 2012, GNMA then sold, assigned, transferred, and conveyed Ms. James's mortgage to LoanCare. Upon information and belief, LoanCare serviced Ms. James's mortgage on behalf of New Freedom, GMNA, and then itself from at least 2009 to at least July 11, 2014.

77.     Sections 4 and 7 of Plaintiff James's mortgage were materially the same as paragraphs 4 and 7 of the Lewis mortgage.  *See* ¶ 54, *supra*.  A true and correct copy of Plaintiff James's mortgage is attached as **Exhibit C**.

78.     Ms. James was charged approximately $2,971.34 and paid amounts for force-placed coverage in connection with the force-placed insurance coverage that was first placed on

her property in 2011.

79.     Ms. James was also charged for a redundant insurance policy with an annual rate of $2,912.57 on her home in August 2012 and Ms. James paid amounts for this policy. The policy was backdated to cover June 30, 2011 to August 29, 2011 and was redundant because it covered a subset of the full-year policy force-placed on Ms. James's home in January 2011.

80.     Pursuant to the automated procedures in place, ASIC sent Ms. James two letters on LoanCare letterhead in late 2010 warning that coverage would be forced.  The letters included the same or materially similar representations to those included in the letters sent to Ms. Lewis and Ms. McNeil.

81.      Ms. James received and reviewed a third letter from Defendants on January 19, 2011, indicating that coverage had been ordered for her property carrying an annual "premium" of $2,971.34.

82.     At no time did any Defendants disclose, by any means, to Ms. James that an exclusive relationship between LoanCare and ASIC was already in place and that LoanCare was effectively paid for a bribe to keep that exclusive force-placed relationship in place.

83.     Nor did Defendants disclose to Plaintiff James or the putative Class members that, because of this kickback, LoanCare itself would effectively be paying less than the amount it would charge Ms. James for the force-placed insurance coverage.

84.     It was also never disclosed to Ms. James or the putative Class members that the amounts charged to them covered other illegitimate kickbacks and below cost mortgage-servicing functions not properly charged to them. The amounts kicked back to LoanCare were not reduced from the amount charged resulting in Ms. James paying more than the "cost" of the insurance.

FA7852

85.     The January 19, 2011 letter also misrepresented that the insurance force-placed "[w]ill have significantly higher premiums than standard insurance premiums because [ASIC] has issued the policy without the benefit of normal underwriting guidelines." As explained herein, Ms. James was charged significantly more than standard insurance premiums because the charges also included unearned kickbacks and below-cost mortgage servicing functions not properly charged to Ms. James. A purported lack of "normal underwriting guidelines" did not cause the significantly higher costs.

86.     All putative class members received materially similar letters pursuant to the automated procedures used by Defendants.

87.     There are no material differences between these Defendants' actions and practices directed to Ms. James and their actions and practices directed to the putative class.

### Plaintiffs Elijah and Brenda Lowe

88. Plaintiffs Elijah and Brenda Lowe own a home in Miami-Dade County, Florida.

89.     Paragraphs 4 and 7 of the Lowe mortgage contract are materially the same as paragraphs 4 and 7 of the McNeil mortgage. *See* ¶ 54, *supra*. A true and correct copy of the Lowe Plaintiffs' mortgage contract is attached as **Exhibit D**.

90.     In or about August of 2012, Mr. and Mrs. Lowe's voluntary hazard insurance policy lapsed. LoanCare forced new coverage on their property through ASIC in or around March of 2013.

91.     In or around May of 2013, Mr. and Mrs. Lowe received and reviewed a letter informing them that a hazard insurance coverage was being force-placed on their property. The letter purports to come from LoanCare but was actually sent by ASIC as part of the below-cost mortgage servicing it provides to LoanCare.

FA7852

92.   The letter misrepresented to Mr. and Mrs. Lowe that the higher cost of the force-placed insurance policy was "because the insurance we purchase is issued automatically without evaluating the risk of insuring your property," when in fact the higher cost of the force-placed insurance policy was due to the scheme that Defendants have enacted whereby LoanCare receives a kickback on the cost of the force-placed insurance policy but charges Mr. and Mrs. Lowe and other putative Class members the inflated amount.

93.   The letter also misrepresented that affiliates of LoanCare "may *earn* commissions or income in conjunction with the placement of the coverage[,]" (emphasis added), when in fact, no commission or income is actually "earned" by LoanCare or its affiliates who perform no work in conjunction with the placement of the force-placed insurance.  Instead, a certificate of insurance is issued through ASIC's automated procedures pursuant to the master policy that covers the entire LoanCare portfolio.

94.   LoanCare has renewed the hazard force-placed insurance policy charged to Mr. and Mrs. Lowe since that time.

95.   Mr. and Mrs. Lowe were charged for, paid, and/or still owe amounts for force-placed coverage in connection with this force-placed insurance policy.

96.   Pursuant to the automated procedures in place, Mr. and Mrs. Lowe were sent a letter renewing their force-placed insurance hazard policy on September 23, 2013.

97.   On or around June 23, 2014, the Lowe Plaintiffs received and reviewed a letter from Defendants stating that a new force-placed insurance policy with an effective date of August 31, 2014 had been procured for their property. The letter also stated that if ASIC purchased insurance for the Lowes, an affiliate of LoanCare might benefit.  The letter did not, however, identify the purported benefits to the LoanCare affiliate, or disclose that Plaintiffs

FA7852

would pay more for coverage than LoanCare's actual cost. The letter also included language suggesting it was written by LoanCare or one of its affiliates, and not ASIC.

98. At no time did any Defendants disclose, in the letters to Mr. and Mrs. Lowe or by any other means, that an exclusive relationship between LoanCare and ASIC was already in place and the "commission" or "income" paid to a LoanCare affiliate was not paid for any work, but was simply a bribe to keep that exclusive force-placed relationship in place.

99. Nor was it disclosed to the Lowe Plaintiffs or the putative Class members that because of this kickback, LoanCare itself would effectively be paying a less than what it would charge to Mr. and Mrs. Lowe for the force-placed insurance coverage.

100. Finally, it was never disclosed to Mr. and Mrs. Lowe or the Class members that the amounts charged them covered other illegitimate kickbacks and below cost mortgage-servicing functions not properly charged to them. The amounts kicked back to LoanCare were not credited to the Lowes, resulting in the Lowes paying more than LoanCare's actual cost of coverage.

101. All putative Class members received materially similar letters pursuant to the automated procedures used by Defendants.

102. There are no material differences between these Defendants' actions and practices directed to Mr. and Mrs. Lowe and their actions and practices directed to the putative class.

**CLASS ALLEGATIONS**

**A.     Class Definitions**

103. Plaintiffs bring this action against Defendants pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all other persons similarly situated. Plaintiffs seek to represent the following classes:

Nationwide class:

FA7852

All borrowers who, within the applicable statutes of limitation, were charged for a force-placed insurance policy through LoanCare or its affiliates, entities, or subsidiaries. Excluded from this class are Defendants, their affiliates, subsidiaries, agents, board members, directors, officers, and/or employees.

Florida Subclass:

All Florida borrowers who, within the applicable statutes of limitation, were charged for a force-placed insurance policy through LoanCare or its affiliates, entities, or subsidiaries. Excluded from this class are Defendants, their affiliates, subsidiaries, agents, board members, directors, officers, and/or employees.

104. Plaintiffs reserve the right to modify or amend the definitions of the proposed classes before the Court determines whether certification is appropriate.

105. Defendants subjected Plaintiffs and the respective Class members to the same unfair, unlawful, and deceptive practices and harmed them in the same manner.

**B.**   **Numerosity**

106. The proposed classes are so numerous that joinder of all members would be impracticable. Defendants sell and service millions of mortgage loans and insurance policies in Florida, New York, as well as nationwide. The individual Class members are ascertainable, as the names and addresses of all Class members can be identified in the business records maintained by Defendants. The precise number of Class members for the classes numbers at least in the thousands and can only be obtained through discovery, but the numbers are clearly more than can be consolidated in one complaint such that it would be impractical for each member to bring suit individually. Plaintiffs do not anticipate any difficulties in the management of the action as a class action.

**C.**   **Commonality**

107. There are questions of law and fact that are common to Plaintiffs' and Class

members' claims.  These common questions predominate over any questions that go particularly to any individual member of the Classes.  Among such common questions of law and fact are the following:

a. Whether Defendants charged borrowers for unnecessary insurance coverage including, but not limited to, insurance coverage that exceeded the amount required by law or the borrowers' mortgages;

b. Whether LoanCare breached its mortgage contracts with Plaintiffs and the Class members by charging them for force-placed insurance that included illegal kickbacks (including unwarranted commissions or qualified expense reimbursements, and reinsurance payments) and by charging Plaintiffs and the Class members for servicing their loans;

c. Whether Defendants have been unjustly enriched at the expense of the Plaintiffs and the Class members;

d. Whether LoanCare breached the implied covenant of good faith and fair dealing by entering into exclusive arrangements with ASIC and/or its affiliates, which resulted in inflated amounts for the force-placed insurance coverage being charged to Plaintiffs and the Class members as kickbacks;

e. Whether Defendants manipulated forced-placed insurance purchases in order to maximize their profits to the detriment of Plaintiffs and the Class members;

f. Whether LoanCare or its affiliates perform any work or services in exchange for the "commissions" or other "compensation" they collect;

g. Whether the "qualified expense reimbursements" received by LoanCare are for true expenses or are just kickbacks pursuant to their exclusive relationship with ASIC;

h. Whether LoanCare's charges to Plaintiffs and the Class members are inflated to include kickbacks and unwarranted "commissions" or "expense reimbursements;"

i. Whether LoanCare's charges are inflated to compensate for mortgage servicing activities that ASIC and its affiliates provide to LoanCare, and which are not chargeable to Plaintiffs and the Class members under the terms of their mortgages;

j. Whether the charges are inflated to include the cost of an unlawful captive reinsurance arrangement;

k. Whether LoanCare violated the federal Truth in Lending Act ("TILA") by conditioning its extensions of credit on the purchase of insurance through an affiliate, in direct contravention of the anti-coercion disclosures included in borrowers'

mortgages;

l.  Whether LoanCare violated TILA by failing to disclose kickbacks charged to Plaintiffs and the Class members in their mortgages;

m.  Whether ASIC intentionally and unjustifiably interfered with Plaintiffs' and the Class members' rights under the mortgage contracts by paying kickbacks and providing free or below-cost mortgage servicing functions to LoanCare or its affiliates thereby inducing a breach of the contract;

FA7852

n.   Whether Defendants were associated with the enterprise and agreed and conspired to violate the federal RICO statutes; and

o.   Whether Plaintiffs and the Class members are entitled to damages and/or injunctive relief as a result of Defendants' conduct.

**D.     Typicality**

108.     Plaintiffs are members of the Classes they seek to represent.  Plaintiffs' claims are typical of the Class members' claims because of the similarity, uniformity, and common purpose of the Defendants' unlawful conduct.  Each Class member has sustained, and will continue to sustain, damages in the same manner as Plaintiffs as a result of Defendants' wrongful conduct.

**E.     Adequacy of Representation**

109.     Plaintiffs are adequate representatives of the classes they seek to represent and will fairly and adequately protect the interests of that class.  Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel, experienced in litigation of this nature, to represent them.  There is no hostility between Plaintiffs and the unnamed Class members.  Plaintiffs anticipate no difficulty in the management of this litigation as a class action.

110.     To prosecute this case, Plaintiffs have chosen the undersigned law firms, which are very experienced in class action litigation and have the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

**F.     Requirements of Fed. R. Civ. P. 23(b)(3)**

111.     The questions of law or fact common to Plaintiffs' and each Class member's claims predominate over any questions of law or fact affecting only individual members of the class.  All claims by Plaintiffs and the unnamed Class members are based on Defendants' scheme regarding the force-placed insurance policies and their deceptive and egregious actions

FA7852

involved in securing the force-placed policy.

112.     Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

113.     As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the class as is the case at bar, common questions will be held to predominate over individual questions.

**G.**     **Superiority**

114.     A class action is superior to individual actions in part because of the non-exhaustive factors listed below:

(a)     Joinder of all class members would create extreme hardship and inconvenience for the affected customers as they reside all across the states;

(b)     Individual claims by class members are impractical because the costs to pursue individual claims exceed the value of what any one class member has at stake.  As a result, individual class members have no interest in prosecuting and controlling separate actions;

(c)     There are no known individual class members who are interested in individually controlling the prosecution of separate actions;

(d)     The interests of justice will be well served by resolving the common disputes of potential class members in one forum;

(e)     Individual suits would not be cost effective or economically maintainable as individual actions; and

(f)     The action is manageable as a class action.

FA7852

H.    **Requirements of Fed. R. Civ. P. 23(b)(1) & (2)**

115.    Prosecuting separate actions by or against individual Class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class.

116.    Defendants have acted or failed to act in a manner generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

**COUNT I**

**BREACH OF CONTRACT**
**(against LoanCare)**

117.    Plaintiffs re-allege and incorporate paragraphs 1-116 as if fully set forth herein and further allege as follows.

118.    Plaintiffs and all similarly situated Class members have mortgages that are owned and/or serviced by LoanCare.

119.    Plaintiffs and these Class members' mortgages are written on uniform mortgage forms and contain substantially similar provisions regarding force-placed insurance requirements and its placement by LoanCare.  The force-placed provisions from Plaintiffs' mortgages are set forth above in paragraph 54.

120.    Plaintiffs' mortgages require that they maintain insurance on their property and provide that if they fail to do so, then the lender may obtain insurance coverage to protect its interest in the property, "force place" the coverage, and charge the borrower the cost.

121.    LoanCare, however, charges Plaintiffs and other borrowers more than its "cost" of coverage.  After LoanCare pays ASIC a premium for its master policy, ASIC pays LoanCare gratuitous kickbacks in the form of unmerited "qualified expense reimbursements," unearned

FA7852

"commissions," riskless reinsurance payments, and subsidies for discounted mortgage-servicing functions.  These amounts are effective rebates on the cost of coverage, and are not applied to protecting LoanCare's rights or risk in the collateral for borrowers' mortgage loans.  LoanCare breached the mortgage agreements by, among other things, not giving borrowers the benefit of these rebates and thus charging Plaintiffs and Class members more than its actual cost of coverage.

122.    LoanCare has also breached Plaintiffs' and the Class members' mortgage agreements by charging Plaintiffs and the Class members for excess and unnecessary force-placed insurance coverage, as such coverage does not protect LoanCare's rights in their collateral or cover their risk.

123.    Plaintiffs and the Class members have suffered damages as a result of the LoanCare's breaches of their contracts.

**WHEREFORE**, Plaintiffs, on behalf of themselves and all similarly situated class members, seek compensatory damages resulting from the LoanCare's breach of contract, as well as injunctive relief preventing them from further violating the terms of the Class members' mortgages.  Plaintiffs further seek all relief deemed appropriate by this Court, including attorneys' fees and costs.

## COUNT II

## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (against LoanCare)

124.    Plaintiffs re-allege and incorporate paragraphs 1-116 as if fully set forth herein and further allege as follows.

125.    A covenant of good faith and fair dealing is implied in every contract and imposes upon each party a duty of good faith and fair dealing in its performance.  Common law calls for

36

substantial compliance with the spirit, not just the letter, of a contract in its performance.

126.    Where an agreement affords one party the power to make a discretionary decision without defined standards, the duty to act in good faith limits that party's ability to act capriciously to contravene the reasonable contractual expectations of the other party.

127.    Plaintiffs' and the Class members' mortgage contracts allow LoanCare to force place insurance coverage on the borrower in the event of a lapse in coverage, but do not define standards for selecting an insurer or procuring an insurance policy.

128.    LoanCare is afforded substantial discretion in force-placing insurance coverage. It is permitted to unilaterally choose the company from which it purchases force-placed insurance and negotiates any price for the coverage it procures.  LoanCare has an obligation to exercise the discretion afforded it in good faith, and not capriciously or in bad faith.  Plaintiffs do not seek to vary the express terms of the mortgage contract, but only to insure that LoanCare exercises its discretion in good faith.

129.    LoanCare breached the implied covenant of good faith and fair dealing by, among other things:

(a)    Manipulating the force-placed insurance market by selecting insurers (here, ASIC and its affiliates) that will artificially inflate force-placed insurance charges to include kickbacks to LoanCare or its affiliates and issue excess insurance coverage not necessary to cover LoanCare's risk, and by failing to seek competitive bids on the open market and instead contracting to create "back room" deals whereby an exclusive arrangement is in place for ASIC to issue its own insurance coverage without LoanCare seeking a competitive price;

(b)    Exercising its discretion to choose force-placed insurance in bad faith and in contravention of the parties' reasonable expectations, by purposefully selecting force-placed insurance policies with artificially inflated charges to maximize its own profits;

(c)    Assessing inflated and unnecessary charges against Plaintiffs and the Class and misrepresenting (and omitting to disclose) the reasons for the

inflated cost of coverage;

(d)    Collecting a percentage of the amounts charged to borrowers and not passing that percentage on to the borrower, thereby creating the incentive to seek the highest-priced premiums possible;

(e)    Charging Plaintiffs and the Class the cost of having the vendor perform its obligation of servicing its mortgage portfolio, which is not properly chargeable to Plaintiffs or the Class;

(f)    Charging Plaintiffs and the Class for expense reimbursements or commissions when the insurance is prearranged, no work is done by LoanCare or its affiliates, no expenses related to the placement of the force-placed insurance are incurred, and no commission is due; and

(h)    Charging Plaintiffs and the Class an inflated charge for the force-placed insurance due to the captive reinsurance arrangement.

130.    As a direct, proximate, and legal result of the aforementioned breaches of the covenant of good faith and fair dealing, Plaintiffs and the Class have suffered damages.

**WHEREFORE**, Plaintiffs, on behalf of themselves and similarly situated Class members, seek a judicial declaration that the amounts charged and the terms of the force-placed insurance policies violate the duties of good faith and fair dealing. Plaintiffs also seek damages resulting from the LoanCare's breaches of its duties. Plaintiffs further seek all relief deemed appropriate by this Court, including attorneys' fees and costs.

## COUNT III

### UNJUST ENRICHMENT
### (against LoanCare)[10]

131.    Plaintiffs re-allege and incorporate paragraphs 1-116 as if fully set forth herein and further allege as follows.

132.    LoanCare received benefits from Plaintiffs and Class members in the form of unwarranted kickbacks, including "expense reimbursements" or "commissions," captive

---

[10] Plaintiffs plead their unjust enrichment claim against LoanCare in the alternative to their contractual claims against them.

FA7852

reinsurance arrangements, and subsidized loan servicing costs.

133.    LoanCare entered into an agreement whereby the insurance vendor – here, ASIC and its affiliates – would provide below-cost mortgage servicing activities and cover LoanCare's entire portfolio of loans with a master policy and issue certificates of insurance when a borrower's voluntary policy lapsed.   LoanCare would then charge Plaintiffs and the Class amounts for the force-placed insurance that had been artificially inflated to include the kickbacks described above and then retain the amounts of those kickbacks for itself.   The force-placed policies imposed on borrowers therefore cost less than what LoanCare actually paid for them.

134.    ASIC paid and collected significant monies in kickbacks, commissions, reimbursements, and reinsurance tied directly to the cost of the force-placed insurance premium (as a percentage).   Commissions or kickbacks were paid directly to LoanCare or its affiliates in order to be able to exclusively provide force-placed insurance policies.   ASIC and its affiliates were mere conduits for the delivery of the kickbacks and improper charges to LoanCare or its affiliates.

135.    These payments directly benefitted LoanCare and/or its affiliates and were taken to the detriment of the borrower.   The kickbacks (in the form reimbursements, commissions, or reinsurance arrangements, as well as subsidized costs) were subsumed into the charges to borrowers for the force-placed insurance and ultimately paid by them.   Therefore, LoanCare had the incentive to charge and collect unreasonably inflated prices for the force-placed policies.

136.    Further, LoanCare was unjustly enriched through financial benefits in the form of increased interest income and other fees that resulted when the amounts for the force-placed insurance policies were added to the Class members' mortgage loans and through duplicative insurance based upon the Lender Loss Payable Endorsement or the Standard Mortgage Clause.

FA7852

137.    As a result, Plaintiffs and the Class members have conferred a benefit on LoanCare.

138.    LoanCare had knowledge of this benefit and voluntarily accepted and retained the benefit conferred on it.

139.    LoanCare will be unjustly enriched if it is allowed to retain the aforementioned benefits, and each Class member is entitled to recover the amount by which LoanCare was unjustly enriched at his or her expense.

**WHEREFORE**, Plaintiffs, on behalf of themselves and all similarly situated Class members, demand an award against LoanCare in the amounts by which it has been unjustly enriched at Plaintiffs' and the Class Members' expense, and such other relief as this Court deems just and proper.

## COUNT IV

## TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP
### (against ASIC)

140.    Plaintiffs re-allege and incorporate paragraphs 1-116 as if fully set forth herein and further allege as follows.

141.    Plaintiffs and the Class members have advantageous business and contractual relationships with LoanCare pursuant to the mortgage contracts.  Plaintiffs and the Class members have legal rights under these mortgage contracts.  For example, Plaintiffs and the Class members have a right not to be charged exorbitant charges in bad faith for forced-place insurance.

142.    ASIC has knowledge of the mortgage contracts and the advantageous business and contractual relationships between Plaintiffs and the Class members and LoanCare.  ASIC is not a party to the mortgage contracts, nor is it a third-party beneficiary of the mortgage contracts.

40

Further, ASIC does not have any beneficial or economic interest in the mortgage contracts.

143.    ASIC, in bad faith and with the intent to maximize all the Defendants' profits, intentionally and unjustifiably interfered with Plaintiffs' and the Class's rights under the mortgage contracts, as described above, by, *inter alia*, entering into an exclusive relationship with LoanCare and its affiliates, whereby they provide kickbacks (in the form of unmerited expense reimbursements or commissions, or reinsurance premiums without the corresponding risk, as well as below cost mortgage servicing) to LoanCare in exchange for the exclusive right to force-place insurance at inflated and unnecessary amounts which are purposefully and knowingly charged to Plaintiffs and the Class members.

144.    Plaintiffs and the Class members have been damaged as a result of ASIC's interference with their mortgage contracts by being charged bad faith, exorbitant, and illegal charges for force-placed insurance in contravention of their rights under the mortgages.

**WHEREFORE**, Plaintiffs, on behalf of themselves and all Class members similarly situated, seek a judgment in their favor against ASIC for the actual damages suffered by them as a result of ASIC's tortious interference.  Plaintiffs also seek all costs of litigating this action, including attorneys' fees.

## COUNT V

## VIOLATIONS OF THE TRUTH IN LENDING ACT, 15 U.S.C. § 1601, et seq.
### (against LoanCare)

145.    Plaintiffs re-allege and incorporate paragraphs 1-116 as if fully set forth herein and further allege as follows.

146.    Plaintiffs' and the Class Members' mortgages were consumer credit plans secured by their principal dwellings, and were subject to the disclosure requirements of the Truth in Lending Act ("TILA"), 15 U.S.C.§ 1601, *et seq.*, and all related regulations, commentary, and

41

interpretive guidance promulgated by the Federal Reserve Board.

147. LoanCare is a "creditor" as defined by TILA because it owned and/or serviced Plaintiffs' mortgages and changed the terms of the mortgages so as to create a new mortgage obligation, of which LoanCare was the creditor.

148. Pursuant to TILA, LoanCare was required to accurately and fully disclose the terms of the legal obligations between the parties. *See* 12 C.F.R. § 226.17(c).

149. LoanCare violated TILA, specifically 12 C.F.R. § 226.17(c), when it: (i) added force-placed insurance charges to Plaintiffs' mortgage obligations and failed to provide new disclosures; and (ii) failed at all times to disclose the amount and nature of the kickbacks, reinsurance, discount mortgage servicing, and other profiteering involving LoanCare and/or its affiliates as a result of the purchase of force-placed insurance.

150. When LoanCare changed the terms of Plaintiffs' mortgages to allow previously unauthorized kickbacks and insurance amounts in excess of its interests in the property, it changed the finance charge and the total amount of indebtedness, extended new and additional credit through force-placed insurance charges, and thus created a new debt obligation. Under TILA, LoanCare was then required to provide a new set of disclosures showing the amount of the insurance charges (i.e. finance charges) and all components thereof. On information and belief, LoanCare increased the principal amount under Plaintiffs' mortgages when it force-placed the insurance, which was a new debt obligation for which new disclosures were required.

151. LoanCare adversely changed the terms of Plaintiffs' loan after origination in order to allow a kickback on the force-placed insurance charges. These kickbacks are not authorized in the mortgage in any clear and unambiguous way. LoanCare never disclosed to borrowers the amount of the "commissions," "expense reimbursements," or other unearned profits paid to them

FA7852

or their affiliate.

152.     LoanCare also violated TILA by adversely changing the terms of Plaintiffs' loan after origination by requiring and threatening to force-place more insurance than necessary to protect its interest in the property securing the mortgages.

153.     Acts constituting violations of TILA occurred within one year prior to the filing of the original Complaint in this action, or are subject to equitable tolling because LoanCare's kickbacks, reinsurance, and other unearned revenue-generating scheme was the subject of secret agreements among it and its affiliates and was concealed from borrowers.

154.     Plaintiffs and Class members have been injured and have suffered a monetary loss arising from LoanCare's violations of TILA.

155.     As a result of LoanCare's TILA violations, Plaintiffs and Class members are entitled to recover actual damages and a penalty of $500,000.00 or 1% of LoanCare's net worth, as provided by 15 U.S.C. § 1640(a)(1)-(2).

156.     Plaintiffs and Class members are also entitled to recovery of attorneys' fees and costs to be paid by LoanCare, as provided by 15 U.S.C. § 1640(a)(3).

**WHEREFORE**, Plaintiffs, on behalf of themselves and all Class members similarly situated, seek a judgment in their favor against LoanCare awarding actual damages and a penalty of $500,000.00 or 1% of LoanCare's net worth, as provided by 15 U.S.C. §1640(a)(1)-(2), as well as of attorneys' fees and costs to be paid by LoanCare, as provided by 15 U.S.C. § 1640(a)(3).

## COUNT VI

### Violation of RICO, 18 U.S.C. § 1962(c)
### (Plaintiffs against All Defendants)

157.     Plaintiffs incorporate paragraphs 1-116 herein as if fully set forth herein and

FA7852

further allege as follows.

158.   At all relevant times, Defendants were employed by and associated with an illegal enterprise, and conducted and participated in that enterprise's affairs, through a pattern of racketeering activity consisting of numerous and repeated uses of the interstate mails and wire communications to execute a scheme to defraud, all in violation of RICO, 18 U.S.C. § 1962(c).

159.   The RICO enterprise, which engaged in and the activities of which affected interstate and foreign commerce, was comprised of an association in fact of entities and individuals that included LoanCare, its affiliates, and ASIC and its affiliates.

160.   The members of the RICO enterprise had a common purpose: to increase and maximize their revenues by forcing Plaintiffs and Class members to pay inflated amounts for force-placed insurance through a scheme that inflated such amounts to cover kickbacks and expenses associated with servicing LoanCare's entire loan portfolio, and concealing from Plaintiffs and Class members the true nature of those charges.  Defendants shared the bounty of their enterprise by sharing the illegal profits generated by the joint scheme.

161.   The RICO enterprise functioned over a period of years as a continuing unit and had a maintained an ascertainable structure separate and distinct from the pattern of racketeering activity.

162.   LoanCare and ASIC conducted and participated in the affairs of this RICO enterprise through a pattern of racketeering activity that projects into the future, lasted more than one year, and that consisted of numerous and repeated violations of federal mail and wire fraud statutes, which prohibit the use of any interstate or foreign wire or mail facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.

163.   ASIC directed and controlled the enterprise as follows:

FA7852

    a.  ASIC specifically developed and implemented guidelines and standards for the timing and content of the cycle of deceptive letters sent to borrowers about force-placed insurance, to which the LoanCare agreed;

    b.  ASIC drafted the language of the fraudulent letters and correspondence to borrowers that was specifically designed to deceive borrowers into believing that they were coming from the LoanCare. The letters fraudulently misrepresented the true nature of the "cost" of the insurance forced on their properties, and these letters were approved by the LoanCare;

    c.  ASIC ran the day-to-day operations of the force-placed scheme by, *inter alia*, tracking LoanCare's portfolio, mailing a cycle of form letters to borrowers notifying them that insurance coverage would be forced, and misrepresenting to borrowers both that they would be charged only the costs of coverage and that a LoanCare affiliate would be paid as compensation for work performed;

    d.  ASIC paid kickbacks to LoanCare and its affiliates to maintain Defendants' exclusive relationship and keep their force-placed scheme moving forward;

164.  LoanCare directed and controlled the enterprise as follows:

    a.  LoanCare outsourced loan servicing functions to ASIC, including authorizing ASIC to send the three-letter cycle of notice letters to borrowers informing them that coverage was being forced on their properties;

    b.  LoanCare charged borrowers amounts for coverage above and beyond its true cost of coverage, without disclosing to borrowers that it had received a rebate on the "premium" indicated in their notice letters;

    c.  LoanCare deducted amounts from borrowers' excrow accounts for forced coverage, knowing that the amounts deducted exceeded its cost of coverage;

    d.  LoanCare charged borrowers interest on the amounts already charged for forced coverage, knowing that the amounts deducted exceeded its cost of coverage.

165.  Both Defendants directed and controlled the enterprise as follows:

    a.  by directing, controlling, and creating an enterprise and arrangement by which the LoanCare would receive unearned kickbacks;

    b.  by directing, controlling, and creating an enterprise and arrangement by which LoanCare would receive illegitimate revenues (ultimately charged to borrowers) in the form of direct payments, debt forgiveness, expense reimbursements, or

"commissions," that were merely bribes to keep the exclusive relationship in place and not disclosing same to borrowers;

c.  by directing, controlling, and creating an enterprise and program by which LoanCare never charged the borrowers its actual or effective cost of the force-placed insurance policies;

d.  by directing, controlling, and creating an enterprise and program where ASIC took money directly from borrowers escrow accounts  and took amounts which are not the actual or effective "cost" for lender placed insurance but instead, including illegal bribes and kickbacks;

e.  by designing and directing an exclusive arrangement by which Defendants manipulated the force-placed insurance market in order to artificially inflate the amounts they charge to borrowers for force-placed insurance.  The charges were inflated to provide the LoanCare and their affiliates with kickbacks disguised as "commissions" or expense reimbursements, or to cover the cost of discounted mortgage servicing, and/or to provide the LoanCare with other forms of kickbacks.  ASIC and its affiliates benefit by securing business from the LoanCare—it provides kickbacks to them at the expense of the borrowers who are charged the inflated charges;

f.  by developing and implementing guidelines and criteria to determine when force-placed insurance is placed an a borrower's home, in what amount, for what coverages and for what period of time—all of which resulted in inferior and more expensive insurance that covered time periods where no claims were made or resulted in "double coverage;" and

g.  by developing and implementing an automated system to send the cycle of deceptive letters to borrowers, to determine the type, time period and amount of substandard and unnecessary coverage, and to remove or charge borrowers' escrow accounts automatically for improper and inflated charges.

166.    In order to further its control and direction of the enterprise, ASIC paid bribes and kickbacks to LoanCare in the form of unearned commissions, direct payments, reinsurance premiums, expense reimbursements, and below-cost mortgage servicing functions.

167.    As part of and in furtherance of the scheme to defraud, Defendants made numerous material omissions and misrepresentations to Plaintiffs and Class members with the

FA7852

intent to defraud and deceive them.

168. For example, ASIC, with the approval of the LoanCare, sent form letters to Plaintiffs on LoanCare letterhead through the U.S. mail, stating that LoanCare would purchase or renew force-placed coverage if voluntary insurance was not secured by a certain date. These Defendants represented in the letters that LoanCare would purchase the required coverage and charge the borrower "the cost of the insurance." In making these statements, Defendants knowingly and intentionally falsely stated that the amounts for force-placed insurance that Plaintiffs were charged represented the actual cost of the insurance premiums, when in fact such amounts also included kickbacks and other costs paid as bribes to the LoanCare, and Plaintiffs were charged significantly more than LoanCare had paid for coverage.

169. Defendants had a duty to correct this mistaken impression. These misrepresentations and omissions were material, as they helped Defendants advance their scheme to charge Plaintiffs unreasonably high amounts for force-placed insurance and were designed to lull Plaintiffs and the Class into believing that the charges were legitimate. Plaintiffs (and other homeowners) would not have paid, or would have contested these specific charges had Defendants disclosed that the illegal bribes and kickbacks were included and that these forced-charges did not represent simply the cost of the required insurance coverage. For example, such letters were sent to Plaintiff Leslie Lewis on May 9, 2012 and June 15, 2012 through the U.S. mail; to Plaintiff Kimberley James in late 2010; to the Lowe Plaintiffs in May 2013, and on September 23, 2013 and June 23, 2014; and to Plaintiff McNeil throughout 2012, 2013, and 2014.

170. ASIC and its affiliates, with the approval of the LoanCare and on LoanCare letterhead, also sent Plaintiffs force-placed insurance notices through the U.S. mail informing them that force-placed insurance would cost more "because the insurance we purchase is issued

FA7852

automatically without evaluating the risk of insuring your property," or because LoanCare had issued coverage "without the benefit of normal underwriting guidelines," when in fact, the inflated amounts charged to Plaintiffs and the class were due to kickbacks and other impermissible costs provided to LoanCare and included in the amounts charged Plaintiffs and the Class members.   Defendants had a duty to correct this mistaken impression.

171.   This misrepresentation was material, as it gave Defendants a colorable reason to charge Plaintiffs unreasonably inflated amounts for insurance and would have influenced Plaintiffs' decisions whether to pay the charges or contest them.   For example, had Plaintiffs known that LoanCare was effectively paying much less than what it charged to Plaintiffs; Plaintiffs would not have paid or would have contested the charges for force-placed insurance. Letters including this misrepresentation were sent to Plaintiff Lewis on May 9, 2012 and June 15; to Plaintiff James in late 2010 and on January 19, 2011; to the Lowes in May 2013; and to Plaintiff McNeil throughout 2012 to 2014 also through U.S. mail.

172.   The letters sent also included the representation that LoanCare "ha[s] incurred expenses in placing this policy as a result we may receive reimbursement for such expenses from the insurance company."   This statement was inaccurate because LoanCare did not incur any expenses in the placement of the policy.   The FPI coverage was issued through a certificated pursuant to the master policy already in place and automatically issued by ASIC when ASIC's computers detected a lapse in coverage.   And the payments to LoanCare were kickbacks, not reimbursements for actual expenses or earned income or commissions, and were not paid in connection with any work performed to place the coverage forced on the borrower's property. Defendants had a duty to correct this mistaken impression. Letters including this misrepresentation were sent to Plaintiff Lewis on May 9, 2012 and June 15, 2012; to Plaintiff

FA7852

James in late 2010; to the Lowes on September 23, 2013 and June 23, 2014; and to Plaintiff McNeil throughout 2012 to 2014 also through U.S. Mail.

173. The May 2013 letter to the Lowes also misrepresented that affiliates of LoanCare "may *earn* commissions or income in conjunction with the placement of the coverage[,]" (emphasis added), when in fact, no commission or income is actually "earned" by LoanCare or its affiliates who perform no work in conjunction with the placement of the force-placed insurance.  Instead, a certificate of insurance is issued through ASIC's automated procedures pursuant to the master policy that covers the entire LoanCare portfolio.

174.    For the purpose of executing the scheme to defraud, Defendants sent, mailed, and transmitted, or caused to be sent, mailed, or transmitted, in interstate or foreign commerce numerous materials, including but not limited to the notices and letters described above informing Plaintiffs and Class members that they could charge Plaintiffs and Class members unreasonably high amounts for force-placed insurance.

FA7852

175.    This scheme to defraud proximately injured Plaintiffs and the Class members because it prevented them from making an informed decision regarding whether to dispute or pay the force-placed charges, or whether to allow new coverage to be placed on their property. Had they known that the charges had been artificially inflated to include kickbacks and other improper charges, they would not have paid them or would have contested them. Defendants also transferred sums among themselves, including but not limited to kickbacks, in furtherance of their scheme to defraud Plaintiffs and Class members, in violation of the wire fraud statutes.

176.    By reason and as a result of Defendants' conduct and participation in the racketeering activity alleged herein, Defendants have caused damages to Plaintiffs and Class members in the form of unreasonably high force-placed insurance premiums.

WHEREFORE, Plaintiffs and Class members seek compensatory and treble damages, and attorneys' fees and costs, pursuant to 18 U.S.C. § 1964(c).

### COUNT VII
### Violation of RICO, 18 U.S.C. § 1962(d)
### (Plaintiffs against all Defendants)

177.    Plaintiffs incorporate paragraphs 1-116 and 157-176, as if fully set forth herein and further allege as follows.

178.    At all relevant times, Defendants were associated with the enterprise and agreed and conspired to violate 18 U.S.C. § 1962(d). Defendants agreed to conduct and participate, directly and indirectly, in the conduct and affairs of the enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

179.    LoanCare and ASIC illegally agreed to violate RICO, 18 U.S.C. § 1962(d), by, *inter alia*:

    a.    Agreeing that ASIC and its affiliates would be LoanCare's exclusive force-placed insurance providers and would extract unreasonably inflated amounts from

LoanCare's customers.  Defendants also agreed that ASIC would pay kickbacks to LoanCare or its affiliates;

b.  Agreeing that ASIC would monitor LoanCare's mortgage portfolios for lapses in voluntary insurance and would, with the approval of LoanCare, send misleading notices to borrowers.  These misleading notices would inform the borrowers that if new coverage were not procured, coverage would be forced, the borrower would be charged "the cost of the insurance" and earned "commissions" payments would be paid to a LoanCare affiliate;

c.  Entering into illusory commission or other agreements in order to disguise the true nature of the amounts charged to borrower under the guise of force-placed insurance; and

d.  Agreeing to commit two or more predicate acts as described above in Count VI.

180.    Upon information and belief, LoanCare affiliates pass profits from this scheme to LoanCare through credits in their general ledge accounts.

181.    Defendants committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including but not limited to the acts set forth above.

182.    As a result of Defendants' violations of 18 U.S.C. § 1962(d), Plaintiffs and Class members suffered damages in the form of unreasonably high force-placed insurance premiums.

**WHEREFORE,** Plaintiffs and Class members seek compensatory and treble damages, and attorneys' fees and costs, pursuant to 18 U.S.C. § 1964(c).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and all similarly situated individuals, demand judgment against Defendants as follows:

(1)    Declaring this action to be a proper class action maintainable pursuant to Rule 23(a) and Rule 23(b)(1) and (2), or Rule 23(b)(3) of the Federal Rules of Civil Procedure and declaring Plaintiffs and her counsel to be representatives of the Class;

FA7852

(2)    Enjoining Defendants from continuing the acts and practices described above;

(3)    Awarding damages sustained by Plaintiffs and the Class members as a result of LoanCare's breaches of the subject mortgage contracts and the implied covenant of good faith and fair dealing, together with pre-judgment interest;

(4)    Finding that Defendants have been unjustly enriched and requiring Defendants to refund all unjust benefits to Plaintiffs and the Class, together with pre-judgment interest;

(5)    Awarding Plaintiffs and the Class costs and disbursements and reasonable allowances for the fees of Plaintiffs' and the Class's counsel and experts, and reimbursement of expenses;

(6)    Awarding actual damages and a penalty of $500,000 or 1% of LoanCare's net worth as provided by 15 U.S.C. § 1640 (a)(1)-(2), and attorneys' fees and costs as provided by 15 U.S.C. § 1640 (a)(3)

(7)    Awarding damages sustained by Plaintiffs and the Class as a result of ASIC's tortious interference;

(8)    Awarding compensatory and treble damages, and attorneys' fees and costs under the federal RICO statute; and

(9)    Awarding such other and further relief the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs and the Class request a jury trial for any and all Counts for which a trial by jury is permitted by law.

Respectfully submitted this 23rd day of March, 2016.

By: /s/ Adam M. Moskowitz

FA7852

| | |
|---|---|
| Adam M. Moskowitz, Esq.<br>Florida Bar No. 984280<br>amm@kttlaw.com<br>Thomas A. Tucker Ronzetti, Esq.<br>Florida Bar No. 965723<br>tr@kttlaw.com<br>Rachel Sullivan, Esq.<br>Florida Bar No. 815640<br>rs@kttlaw.com<br>Robert J. Neary, Esq.<br>Florida Bar No. 81712<br>rn@kttlaw.com<br>**KOZYAK TROPIN &**<br>**THROCKMORTON LLP**<br>2525 Ponce de Leon Blvd., 9th Floor<br>Coral Gables, FL 33134<br>Telephone:  (305) 372-1800<br>Facsimile:   (305) 372-3508<br>*Counsel for Plaintiffs* | Aaron S. Podhurst, Esq.<br>Florida Bar No. 63606<br>apodhurst@podhurst.com<br>Peter Prieto, Esq.<br>Florida Bar No. 501492<br>pprieto@podhurst.com<br>Matthew Weinshall, Esq.<br>Florida Bar No. 84783<br>mweinshall@podhurst.com<br>**PODHURST ORSECK, P.A.**<br>City National Bank Building<br>25 West Flagler Street, Suite 800<br>Miami, Florida 33130<br>Telephone: 305-358-2800<br>Facsimile: 305-358-2382<br>*Counsel for Plaintiffs* |
| Lance A. Harke, Esq.<br>Florida Bar No. 863599<br>lharke@harkeclasby.com<br>Sarah Engel, Esq.<br>Florida Bar No. 991030<br>sengel@harkeclasby.com<br>Howard M. Bushman, Esq.<br>Florida Bar No. 0364230<br>hbushman@harkeclasby.com<br>**HARKE CLASBY & BUSHMAN LLP**<br>9699 NE Second Avenue<br>Miami Shores, Florida 33138<br>Telephone:     (305) 536-8220<br>Facsimile:       (305) 536-8229<br>*Counsel for Plaintiffs* | John J. Uustal, Esq.<br>Florida Bar No. 73547<br>jju@kulaw.com<br>Jordan M. Lewis, Esq.<br>Florida Bar No. 97997<br>**KELLEY UUSTAL, PLC**<br>700 S.E. 3rd Ave., Suite 300<br>Ft. Lauderdale, FL 33316<br>Telephone: (954) 522-6601<br>Facsimile: (954) 522-6608<br>*Counsel for Plaintiffs* |
| Stephen J. Fearon, Jr., Esq.<br>stephen@sfclasslaw.com<br>Thomas G. O'Brien, Esq.<br>thomas@sfclasslaw.com<br>**SQUITIERI & FEARON, LLP**<br>32 East 57th Street, 12th Floor<br>New York, New York 10022<br>Telephone:   (212) 421-6492<br>Facsimile:   (212) 421-6553<br>*Counsel for Plaintiffs* | |

FA7852

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the foregoing was filed with the Court via CM/ECF on

March 23, 2016 and served on all counsel of record by the same means.

By: <u>/s/ Adam M. Moskowitz</u>

FA7852